AGNES H. KAVANAUGH *et al.* Appellees, *vs.* MARTIN J. KAVANAUGH *et al.* Appellants.

*Opinion filed October 28, 1913.*

1. DEEDS—*whether deed is well delivered is a question of intention.* Whether a deed was delivered so as to take effect as a present conveyance of the title must be determined from the words and acts of the parties in connection with the circumstances attending the transaction, as the question is one of intention.

2. SAME—*momentarily placing deed in hands of grantee does not necessarily constitute delivery.* Momentarily placing a deed in the hands of the grantee does not constitute a valid delivery if the grantor did not intend that the title should then pass and that he should lose all control over the deed, and he still continues to exercise acts of ownership over the property as before, pays the taxes, makes repairs, uses the rents and treats the property as his own until his death.

3. SAME—*a deed is ineffectual as a conveyance if grantor retains control over it.* It is indispensable to the delivery of a deed that the grantor shall part with control over it with the intention that it shall immediately become operative to convey the estate described in it, and if the grantor retains any dominion or control over the deed it is ineffective as a conveyance.

4. SAME—*effect of a delivery in escrow upon conditions—burden of proof.* Where a deed, recorded after the grantor's death, is claimed to have been delivered in escrow upon conditions which were subsequently performed, the burden is upon the grantee to show what the conditions were and their performance.

5. EVIDENCE—*what expressions in a letter are competent as characterizing act of depositary.* Where the depositary of a deed testifies that he received the deed within a day or two after its execution and remembered writing and sending a letter to the

grantor, statements in a letter from him to the grantor, which was found in the grantor's possession, to the effect that the papers would not go out of the depositary's hands but would be just as safely guarded as if in the grantor's hands and that the depositary would do in the matter as he had told the grantor the day before that he would do, are competent as characterizing the act of the depositary in receiving the possession of the deed and as indicating the intention of the deposit, but the letter itself is not competent as original evidence of the delivery of the deed to the depositary.

APPEAL from the Circuit Court of Cook county; the Hon. ADELOR J. PETIT, Judge, presiding.

ANTOINETTE FUNK, and HIRAM T. GILBERT, for appellants.

ALEXANDER SULLIVAN, and GEO. H. KRIETE, (JAMES E. MUNROE, and M. PAUL NOYES, of counsel,) for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

This is an appeal from a decree of partition of the real estate of Dennis Kavanaugh, deceased, and the controversy relates to a deed purporting to have been executed by him and recorded after his death, which the complainants asked to have set aside and which the court did set aside.

Dennis Kavanaugh died intestate on August 9, 1904, leaving a widow, Agnes H. Kavanaugh, (who was his third wife,) their two infant daughters, Agnes Kavanaugh and Mildred Marie Kavanaugh, and his four sons, Dennis F. Kavanaugh by his first marriage, and Martin J. Kavanaugh, Harry J. Kavanaugh and George M. Kavanaugh by his second marriage, his heirs. Dennis F. Kavanaugh conveyed his interest in the subject matter of this litigation to Agnes H. Kavanaugh. Dennis Kavanaugh was divorced from his first wife in 1876 and soon after married his second wife,

with whom he lived until her death, in 1898. He accumulated property, and in September, 1901, being then forty-nine years old, he owned real estate valued at $107,200, more than one-half of it being improved property in the city of Pontiac, fronting on the public square. He also owned personal property to the amount of $20,000 or more, and a saloon on VanBuren street, in the city of Chicago, from which he received a profit of $15,000 a year. A short time before, he had met and courted Agnes Murphy, and on September 16, 1901, he married her, having procured a license for that purpose on September 13. At that time his son Martin was about twenty-four years old, Harry twenty-three years and George fifteen years. Prior to this time Kavanaugh had lived in Pontiac, and for many years had kept an account with the Livingston County National Bank, whose president, D. C. Eylar, was his intimate friend and had charge of all his property in the city of Pontiac. Before the marriage Kavanaugh told Eylar of his engagement, and said to him that he felt it would be no more than right to give to his sons a part of his property in the accumulation of which their mother had assisted, and that he intended to make a conveyance to Harry or to Harry and his brothers but did not want it put on record, because he did not want Martin, who was disposed to be wild, to know about it. He said he had plenty of property besides that mentioned in the deed. On September 14, 1901, James R. Wash, who lived in Pontiac and had been admitted to the bar but did not practice law, was in Kavanaugh's saloon, when Kavanaugh told him he wanted to make a deed of some Pontiac property to his boys but did not want to make it direct to Martin and George, who were inclined to be wild and dissipated and would not take care of it. Kavanaugh did not know how to make the deed, and Wash suggested that he make the deed to Harry as trustee for the three. Kavanaugh told Wash the boys' mother had helped

make the money and he wanted it put so that the boys would have it, but did not want them to know that they had it or George or Martin to get it outright then. Wash wrote the deed and attested its execution as a witness, and Kavanaugh acknowledged it before a notary public in a store near by. Kavanaugh and Wash returned to the saloon, where, in the presence of Harry Kavanaugh and Eylar, Wash said to Dennis Kavanaugh, "You give the deed to Harry, and you, Harry, give your father a dollar." Harry thereupon gave his father a dollar and Dennis gave Harry the deed. What was done with the deed immediately afterward is a matter of inference, for there is no direct evidence in regard to it. At this precise point Wash's memory fails. Harry Kavanaugh, being incompetent, did not testify, and Eylar has no recollection of the occurrence in the saloon. This transaction was on Saturday, and the next day Eylar wrote to Dennis Kavanaugh the following letter:

"PONTIAC, ILL., *Sep. 15, 1901.*

"*Friend Dennis*—Mr. Wash called here this morning and left with me the deed and contract. The papers will not go out of my possession and will be just as safely and carefully guarded as if they were in your own hands. You need never give yourself any uneasiness or a single thought about them, as I shall do in the matter just as I told you yesterday that I would do. I am glad that you signed the papers as a precautionary measure and for Harry's sake as well. He is trying to make a man of himself, and if there is anything in him this act of yours will show him that you have confidence in his integrity and his interest at heart as well. I have not yet said anything to Baldwin since I came back, about the repairs he spoke to you of wanting done. I will talk to him about the matter and will report to you after I learn that you have returned from Mount Clemens. You have my best wishes for the successful ending of the very important change in your life that you are so soon to make. May peace, contentment and happiness be yours for the balance of your days, is the sincere wish of

"Yours truly,

D. C. EYLAR."

This letter is objected to as incompetent. It is incompetent as original evidence of the delivery of the deed to Eylar. So far as the defendants are concerned, it is the

statement of a stranger not made under oath or subject to cross-examination. It was, however, shown by Eylar's testimony that he received the deed within a day or two of its date and retained it until Dennis Kavanaugh's death. The letter was found in Dennis Kavanaugh's pocket after his death, and Eylar testified that he remembered writing and sending the letter. The following two sentences of the letter were competent: "The papers will not go out of my possession and will be just as safely and carefully guarded as if they were in your own hands." "You need never give yourself any uneasiness or a single thought about them, as I shall do in the matter just as I told you yesterday that I would do." They were contemporary with and characterized the act of the depositary in receiving the possession of the deed and indicate the intention of the deposit.

Eylar testified that he did not know at the time he testified where the contract was or what it was. He has no remembrance of the transaction in regard to the deed in Kavanaugh's saloon on Saturday, or of the conversation with Kavanaugh referred to in his letter, written the next day. He placed the deed and the contract together in the bank vault, where they remained in his possession until after Dennis Kavanaugh's death. The next day he handed the deed to Harry Kavanaugh, who had it recorded, but Eylar has no recollection of what became of the contract.

The deed was a statutory warranty deed, with a stated consideration of one dollar and love and affection, conveying the premises in fee simple to Harry J. Kavanaugh, stating at the end that it was in trust for the benefit of Harry J. Kavanaugh, Martin J. Kavanaugh and George M. Kavanaugh. No change occurred in the possession, management or control of the property. Harry Kavanaugh never during his father's lifetime exercised any control over the property or claimed any right to do so or any interest in it. When Eylar requested Mr. Young, an architect, to see Dennis about the remodeling of the hotel which was a part of

the property, Young went to Chicago but found that Dennis was in California, and Harry told him that he would have to refer the matter to his father. Harry visited Pontiac and always stayed at the hotel but never made any claim of ownership. On the other hand, Dennis continued in the absolute management and possession of the property through his tenants. Eylar continued to act as his agent, and the rents were collected and deposited to his credit in the bank along with his other funds, without any separation. Repairs were made and paid for by Dennis and he consented to an assignment of the lease of the hotel. Baldwin, who is referred to in Eylar's letter, was tenant of the hotel at the date of the deed and until May, 1904. He was frequently seeing Dennis Kavanaugh about matters connected with the hotel and Harry had nothing to do with it. Dennis insured the property in his own name, paid all taxes and special assessments, and in all things acted as the owner of the property to the same extent after the date of the deed as before.

Whether the deed was delivered so as to take effect as a present conveyance of the title must be determined from the words and acts of the parties in connection with the circumstances attending the transaction. The question is one of intention,—whether the parties, at the time of the transaction in the saloon, intended that the deed should then take effect according to its terms. The mere placing of a deed in the hands of a grantee does not constitute a delivery if the grantor did not intend that the title should then pass and he should lose control of the deed, and if he continued to exercise acts of ownership over the property as before, paid the taxes, made repairs and treated the property as still his own. (*Wilson* v. *Wilson,* 158 Ill. 567; *Russell* v. *Mitchell,* 223 id. 438; *Elliott* v. *Murray,* 225 id. 1077; *Weigand* v. *Rutschke,* 253 id. 260.) It is indispensable to the delivery of a deed that the grantor shall part with control over it, with the intention that it shall im-

mediately become operative to convey the estate described in it. If the grantor retains any dominion and control over the deed it is ineffectual as a conveyance. (*Stinson* v. *Anderson*, 96 Ill. 373; *Cline* v. *Jones*, 111 id. 563; *Provart* v. *Harris*, 150 id. 40; *Shults* v. *Shults*, 159 id. 654; *Walter* v. *Way*, 170 id. 96.) On the face of the deed it conveyed an absolute estate in fee simple without restriction, but the circumstances are inconsistent with the idea that the grantor intended it to operate immediately. It was only momentarily given to the grantee and was immediately placed in the custody of the grantor's agent. Upon what terms it was left with Eylar does not appear, but it was upon a pledge that it should not go out of his hands and that Eylar would do just as he had the day before said he would do about it. If the contract had reference to the deed its nature does not appear, and the nature of Eylar's promise does not appear, but his letter makes it manifest that the grantor had not then parted with his control of the deed. The deed was not regarded or treated as a present conveyance of the premises in fee but was treated as of no present effect. It was clearly not intended to operate presently; for until he died the grantor continued to treat the property as his own, and the grantee, without objection, acquiesced in such action. Whatever may have been the grantor's intention as to the final effect of the deed, it was not his intention, by what was done in the saloon or afterward, that the deed should then vest in Harry the title to the land and that he should lose control of the deed and the title and ownership of the property. This was necessary to a delivery of the deed. If there was a delivery in escrow upon conditions which were subsequently performed, the burden was upon the grantee to show what such conditions were and their performance.                    *Decree affirmed.*